**SHELL PETROLEUM CORPORATION v. WILKINSON et al.**

No. 356.

District Court, E. D. Louisiana.

Dec. 23, 1937.

Thompson, Mitchell, Thompson & Young, of St. Louis, Mo., and Monroe & Lemann, of New Orleans, La., for complainant.

Gaston L. Porterie, Atty. Gen., James O'Connor, Asst. Atty. Gen., F. A. Blanche, of Baton Rouge, La., and Hugh M. Wilkinson, Sp. Counsel, Lawrence A. Molony, and E. R. Schowalter, all of New Orleans, La., for defendants.

BORAH, District Judge.

This case like that of Texas Company v. Hugh M. Wilkinson et al., and Magnolia Petroleum Company v. Hugh M. Wilkinson et al., D.C., 21 F.Supp. 771, this day decided, involves the construction and meaning of Act No. 6 of the Legislature of Louisiana for the year 1928, Ex. Sess., and its amendments, and the Constitutional amendment of 1930, Act No. 1 of the Extra Session of 1930. Complainant here is seeking the same affirmative relief as was sought in the Texas and Magnolia Cases, and this case is to be distinguished therefrom only in respect to the fact that in the former cases injunctions were sought affecting only the question of the 3 per cent. handling allowance, whereas in this case complainant asks for injunctive relief also against any attempt to recover or account for gasoline which it sold under the temperature-adjustment method. As in the Texas and Magnolia Cases, an interlocutory injunction issued and the matter is now before the court on final hearing.

This case has been submitted on the following agreed stipulation of facts:

Stipulation of Facts.

(1) That all evidence introduced, all objections thereto, and all rulings thereon, in the case entitled the Texas Company v. Hugh M. Wilkinson et al., No. 361, in equity, Baton Rouge Division of this court, and all evidence introduced, objections thereto, and all rulings thereon, in the case entitled Magnolia Petroleum Company v. Hugh M. Wilkinson et al., No. 362, in equity, in the Baton Rouge Division of this Court, in so far as the issues in those cases are the same or similar to the issues in this case, shall be considered as part of the record in this case as fully as if all said evidence had been formally offered, such objections formally made, and such rulings formally given in this cause.

(2) That Shell Petroleum Corporation is a corporation organized and existing under the laws of the state of Virginia, and is duly authorized to do business in the state of Louisiana as "dealer" within the meaning of Act No. 6 of the Extra Session of the Legislature of Louisiana for the year 1928, as amended, and Act No. 1 of the Extra Session of the Legislature of Louisiana for the year 1930, which latter act was adopted November 4, 1930, as a constitutional amendment, being article 6-A, §§ 1–14, of the Constitution of the state of Louisiana of 1921.

(3) That Shell Petroleum Corporation was not doing business in the state of Louisiana as a "dealer" prior to the month of February, 1929.

(4) That it is admitted by defendants only for the purposes of this case, Shell Petroleum Corporation, up to the time of the promulgation of new forms by the collector about May, 1937, has made monthly returns of gasoline imported by it into the state of Louisiana, and gasoline manufactured, compounded, etc., by it in the state of Louisiana, for gasoline tax purposes, under the provisions of said Act No. 6, as amended, and said Act No. 1, and said constitutional amendment, commencing with the month of February, 1929, on forms prepared and furnished to it by the supervisor of public accounts, now collector of revenue, of the state of Louisiana; and that Shell Petroleum Corporation has paid such taxes, as shown by said reports, in the amount shown by said reports, less such deductions as may be shown on said reports. That the term gasoline as herein used includes gasoline, benzine, naphtha and other motor fuel.

(5) That the said Act No. 6 of the Extra Session of 1928, § 4, provided that the dealer should make monthly reports on blanks furnished by the supervisor; that in accordance with previous gasoline tax statutes of Louisiana, the supervisor had prepared forms for use in making returns and remitting taxes under said prior statutes, which forms had contained no provision for any 3 per cent. allowance which had not been referred to in said prior statutes. Act No. 6 of the Extra Session of 1928 authorized a 3 per cent. allowance as defined in said statute, and subsequent to the enactment of Act No. 6 of the Extra Session of 1928 there was a discussion

between E. A. Conway, then supervisor, and attorneys' for certain major oil companies, notably Mr. Henry C. Walker, Jr., representing the Louisiana Oil Refining Company. That in the Walker correspondence which has been admitted in evidence in the Texas-Magnolia suits, Mr. Conway announced that, for the purposes of the 3 per cent. allowance by deduction from gallonage received, his department intended to treat sales as the equivalent of receipts and that it was, therefore, desired by his department that the deduction of 3 per cent. be made by the dealers from gallonage represented by monthly sales, use, and consumption.

That from the time of the exchange of this correspondence down to the time of the letter of demand from Hugh M. Wilkinson, special counsel, dated March 26, 1937, it was the unbroken practice of the dealers in the state of Louisiana, with the exception of the Shell Petroleum Corporation, whose method of reporting will be detailed herein in this stipulation, to report and remit in the manner indicated by Mr. Conway, including the taking of the 3 per cent. allowance on the basis of deduction from actual sales, use, and consumption; that it was the consistent practice of Mr. Conway's department and later of Miss Grosjean's department, to accept reports and remittances on that basis, to furnish blanks on which a 3 per cent. deduction on such basis was indicated in the printed form, to receipt for tax remittances on that basis, to recheck and approve the reports on that basis, and in all matters to act consistently with the original opinion expressed by Mr. Conway in the correspondence to Mr. Walker.

(6) That from the 1st of February, 1929, until March 26, 1937, the supervisor of public accounts, now collector of revenue, accepted remittances by Shell Petroleum Corporation of said gasoline tax, calculated after a deduction of 3 per cent. of the total gallonage reported. That said supervisor of public accounts, later the collector of revenue, during said period, never required any accounting by said Shell Petroleum Corporation of any "losses in handling such motor vehicle fuel" (gasoline, etc.).

(7) That Shell Petroleum Corporation, in making its said monthly returns and remittances of gasoline tax, used the following method:

Shell did not report and remit tax on a basis of gallonage received in the sense of treating as receipts its importations immediately upon coming into the state or its manufactures immediately upon coming into existence.

Shell did render a monthly report divided into two departments.

In its distributing department, which administered the gasoline passed through its bulk storage plants to the filling station trade, Shell treated as "receipts" all gallonage of gasoline delivered to its bulk storage plants as of the time of delivery to such plants.

As to the manufacturing department, Shell treated as "receipts" all loading at the refinery into tank cars for shipment to purchasers within the state as of the moment of loading into said tank cars at said refinery.

On both loading into tank cars by the manufacturing department and delivery at bulk storage plants to the distributing department, the gasoline was computed for purpose of tax return on an adjusted basis of 60° F. However, the gasoline delivered at the bulk storage plants was made subject to actual content measurement when it arrived at the bulk storage plants and the temperature adjustment was calculated against the actual measured gallonage. In the case of the tank car loading by the manufacturing department, there was likewise an actual measurement of actual gallonage content which went into the said cars on which the temperature adjustment to 60° was then made, but any difference, more or less, in actual content was passed on to the purchaser.

With regard to the gasoline gallonage delivered to the bulk storage plants for distribution to gasoline service stations, it is a fact that all such deliveries out of said tank storage plants to the service filling stations were made without any temperature adjustment formula. All such sales were made in less than tank car lots.

It is further stipulated for, at least, nine months of the year, the temperature throughout the state of Louisiana is higher than 60° F.

That during the period under discussion the fact that Shell reported its gasoline "receipts" as adjusted to a temperature of 60° F., in the manner above stated, was known to the representatives of the super-

visor of public accounts, now collector of revenue.

That both with reference to tank car loadings at factory, and deliveries to distributing department at bulk storage plants, the 3 per cent. allowance referred to in the statute was deducted from gallonage reported on a temperature-adjusted basis.

Shell reported through its manufacturing department all gasoline consumed by it at its refinery at Norco each month without any adjustment to 60° and that this amounted to an average of 1,000 gallons consumed each month in said refinery. However, 3 per cent. was deducted from this total gallonage consumed in said refinery upon the periodic remittances of tax.

(8) That it was the practice of the supervisor of public accounts, later collector of revenue, periodically to send her auditors to inspect the duplicate originals of the monthly returns kept by Shell Petroleum Corporation, together with the work sheets attached to said duplicate original returns, and any books or records considered necessary by said auditors to check said returns, and said auditors, upon completion of their inspection, would mark said duplicate original returns "Approved" or "OK" and sign their names on said duplicate originals. Said auditors would then send a report to the said supervisor, detailing the results of their examination of the records of Shell Petroleum Corporation, showing the amount of the tax as calculated by them from the Shell Petroleum Corporation's records; that another employee in the office of said supervisor of public accounts would then compare said reports of said auditors with the original returns of Shell Petroleum Corporation, and, if the figures coincided, would write to the supervisor of public accounts stating that such returns were correct.

(9) That it is the custom within the oil industry in regard to tank car sales to adjust the measurement of gasoline to a temperature of 60° F. That in regard to such transactions within the oil industry and to purchases by the United States government in tank car lots, the National Bureau of Standards has recognized this as a custom of the industry, and that gasoline expands and contracts with changes in temperature. It is also a fact that in the retail trade, that is to say, that in the sale to or use or consumption by the ultimate consumer, the said sale and consumption is on a basis of the measured gallon.

(10) These facts are stipulated subject to the right of either the complainant or defendants to object to their materiality and relevancy, and subject to the right of either the complainant or the defendants to introduce corroborative evidence of the facts herein stipulated, and evidence of the facts not herein stipulated.

(11) That the defendants and each of them are residents of Louisiana and the Eastern District thereof, having their official residence in the Eastern District of Louisiana.

(12) That in all sales to jobbers, the Shell Petroleum Corporation has passed on to said jobbers the benefit of the 3 per cent. allowance.

Counsel for defendants admit that the practice of using a temperature of 60° Fahrenheit for the measure of gasoline in bulk, according to standards of the industry which are recognized by the United States Bureau of Standards, cannot be disputed, and virtually concede that plaintiff was justified in making the temperature adjustment to 60° Fahrenheit in the case of tank car shipments. However, it is urged that there can be no excuse for making returns on the temperature-adjustment basis in the case of measured sales to the taxpaying public through the bulk storage plants and filling stations; the contention against it being that, when as here the tax is imposed and collected on measured sale of gasoline, the return for the tax must be on the same basis as its public collection. There would be force in the argument if the Legislature had intended to impose the tax on the consuming public and had intended to make the dealer a mere collector of the tax from the ultimate consumer. But the wording of these enactments will not warrant that construction. Where as here the tax is computed on gallonage it must necessarily be based upon some definite temperature, and since no standard is prescribed in the statutes levying the tax the court must adopt the standard which is universally recognized in the industry and by the National Bureau of Standards.

In the light of the foregoing and for reasons on file in the Texas and Magnolia Cases, I have reached the conclusion that the 3 per cent. deduction made by complainant in its reports was rightly made and

that complainant was justified in reporting its gallonage adjusted to a temperature of 60° Fahrenheit.

It follows that the preliminary injunction herein granted should be perpetuated and that complainant should have judgment declaring as against the defendants that the complainant was entitled to deduct, and is hereinafter entitled to deduct the 3 per cent. allowance on gallonage reported on a temperature-adjusted basis. Decree to this effect may accordingly be submitted.